# IN THE COURT OF APPEALS OF IOWA

No. 19-1063
Filed September 11, 2019

IN THE INTEREST OF A.R. and S.R.,
Minor Children,

J.R., Father,
    Appellant.

_____

Appeal from the Iowa District Court for Black Hawk County, Daniel L. Block, Associate Juvenile Judge.

The father appeals the termination of his parental rights to his two children. **AFFIRMED.**

Jamie L. Schroeder of The Sayer Law Group, P.C., Waterloo, for appellant father.

Thomas J. Miller, Attorney General, and Anna T. Stoeffler, Assistant Attorney General, for appellee State.

Tammy L. Banning of Juvenile Public Defender's Office, Waterloo, guardian ad litem for minor children.

Considered by Potterfield, P.J., and Tabor and Greer, JJ.

**TABOR, Judge.**

A father, Jeremy, appeals the termination of his parental rights to his two children, A.R. born in 2007, and S.R., born in 2011.[1] The juvenile court terminated Jeremy's parental rights to both children under Iowa Code section 232.116(1) (2019), paragraphs (e), (f), (j), and (*l*). Jeremy does not dispute the statutory grounds for termination. Instead, he maintains termination of his parental rights is not in the children's best interests. *See* Iowa Code § 232.116(2). He also relies on the closeness of his bond with A.R. and S.R. to argue the juvenile court should have placed the children in a guardianship with their maternal grandmother rather than terminate his parental rights. *See id.* § 232.116(3)(c).

Those arguments did not dissuade the juvenile court from terminating. It reasoned: "Permanency through an adoptive placement is clearly in the children's best interests." After our independent review of the record, we reach the same conclusion as the juvenile court.[2]

Given Jeremy's concession of the statutory grounds for termination, we start our analysis with the best-interests question. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010) ("Because the father does not dispute the existence of the grounds, we do not have to discuss this step."). In doing so, we give primary consideration to the children's safety, to the best placement for furthering their

---

[1] The children's mother is deceased.
[2] We review termination decisions de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).

long-term nurturing and growth; and to their physical, mental, and emotional condition and needs. Iowa Code § 232.116(2).[3]

Jeremy's methamphetamine abuse and dealing has long been an issue for the family. Because of that drug exposure, as well as domestic violence, the Iowa Department of Human Services (DHS) removed the children from their home in December 2012 through January 2014. The children's second removal—which led to these termination proceedings—took place in February 2018.[4] The primary danger again was Jeremy's involvement with methamphetamine. Following the children's removal, the State convicted Jeremy

---

[3] The best-interests consideration may include:

(a) Whether the parent's ability to provide the needs of the child is affected by the parent's mental capacity or mental condition or the parent's imprisonment for a felony.

(b) For a child who has been placed in foster family care by a court or has been voluntarily placed in foster family care by a parent or by another person, whether the child has become integrated into the foster family to the extent that the child's familial identity is with the foster family, and whether the foster family is able and willing to permanently integrate the child into the foster family. In considering integration into a foster family, the court shall review the following:

(1) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining that environment and continuity for the child.

(2) The reasonable preference of the child, if the court determines that the child has sufficient capacity to express a reasonable preference.

(c) The relevant testimony or written statement that a foster parent, relative, or other individual with whom the child has been placed for preadoptive care or other care has a right to provide to the court.

Iowa Code § 232.116(2) (a)–(c).

[4] When Jeremy learned police had a warrant for his arrest, he went "on the run." The children's stepmother tested positive for methamphetamine, so the DHS placed the children with their maternal grandmother. They have remained in her care throughout the case.

of possession with intent to distribute methamphetamine. He received an indeterminate prison sentence of twenty-five years in prison.[5]

In the years between the children's two removals, they were present in the home while their father perpetrated domestic violence against their mother and then their step-mother, their mother overdosed and ultimately died, and the police conducted a drug raid. After their second removal, the children reported having often gone without food while in Jeremy's care. They also recalled a turbulent household, where Jeremy would break televisions, phones, plates, and cupboards. The children would cower in their bedroom when their father was acting violently.

Despite having inflicted that trauma, Jeremy refused to allow the children to participate in counseling while in his custody. Only after they entered their grandmother's care did they start therapy.

As for his own mental health, Jeremy did not engage in therapy or drug treatment between the second removal and his arrest.[6] Neither was he participating in substance-abuse or mental-health programming while in prison.

Since Jeremy's incarceration, the DHS has facilitated visitation with the children. When the Department of Corrections placed him at Clarinda, the visits were by Skype technology. When Jeremy moved to Anamosa, the children started to visit twice a month in person. As she has learned about her father's

---

[5] The social worker testified Jeremy "could be out in three years," according to his prison counselor.

[6] Jeremy's addiction is deep-seated. He first used methamphetamine when he was fourteen years old. He has participated in substance-abuse treatment and relapse prevention in the past. Jeremy completed substance-abuse evaluations in November 2017 and April 2018, but never followed through with the recommendations. He did not participate in drug testing as requested.

situation, eleven-year-old A.R. has been more vocal about her frustrations with him being unavailable because of his "bad choices." But the DHS worker acknowledged both children have a bond with Jeremy and enjoy their visits—even though they were nervous for the first interaction in the prison setting.[7]

The DHS worker opined it is not in the children's best interest to wait for Jeremy to become a stable parent. In her words, "The children have already waited 20 months for him and he has made no progress." The children's guardian ad litem also advocated for termination. She aptly summarized why severing Jeremy's parental rights serve the children's best interests:

> These children have waited long enough for their father to make himself a safe, appropriate caregiver for them. The children are in play therapy addressing grief and loss issues related to the death of their mother, but also addressing the trauma that they have endured while they were in the custody of their parents: witnessing domestic violence, being present when the police raided the home, finding, I believe, seven grams of methamphetamine and paraphernalia in the family home, just the food issues that, that have been described as well. As time goes on more is coming out from the children, and I think that's because they are in a safe, stable environment with their grandmother.

Convinced by those sentiments, we reject Jeremy's assertion that termination is not in the long-term best interests of his children. *See In re J.E.*, 907 N.W.2d 544, 547 (Iowa Ct. App. 2017) (holding it was not in child's best interests to wait for permanency while her incarcerated father struggled "to get his own life together"); *see also In re J.E.,* 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (stating a child's safety and need for a permanent home are the "defining elements" in determining best interests). Jeremy's drug

---

[7] The maternal grandmother has tried to facilitate the children's ongoing relationship with Jeremy, putting money in his prison account so he can "get the kids a snack or use the phone."

dealing and domestic abuse created an unsafe home life for his children. Because Jeremy has not committed to tackling his addiction, we share the juvenile court's concern that he "is unwilling to abstain from the use of illegal substances and place the children as a priority in his life." *In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) (reiterating that courts can glean insight for determining children's long-range best interests from parent's past performance).

On top of Jeremy's substance abuse, we consider that his imprisonment for a felony affects his ability to provide for the children's needs. *See* Iowa Code § 232.116(2)(a). Here, the father will not be starting to rebuild his life outside prison for at least three years. *See In re L.M.*, 904 N.W.2d 835, 840 (Iowa 2017) (finding termination of parental rights was in child's best interests because the incarcerated mother's "journey is likely a long one and it is far from complete").

On the flipside, the children feel safe and well-cared for by their maternal grandmother. *Cf.* Iowa Code § 232.116(2)(b)(1) (providing that in determining best interests, court may consider integration into foster family); *In re J.B.L.*, 844 N.W.2d 703, 706 (Iowa Ct. App. 2014). The grandmother told the juvenile court: "it makes me cry when I hear that half the time they weren't being fed, that they had to crawl underneath their bed because of violence, and it just breaks my heart." At the time of the termination hearing, she remained an adoptive option for the children. *See* Iowa Code § 232.116(2)(c) (providing that in determining best interests, courts may consider the statement of a relative caring for children). The social worker testified the grandmother was "open to" the children

having contact with Jeremy "if he's doing well." After considering all the factors in section 232.116(2), we find termination is in the children's best interests.

Although the parties do not cite *In re Q.G.*, 911 N.W.2d 761 (Iowa 2018), we take a moment to consider whether its best-interest analysis impacts the outcome here. *Q.G.* involved a private, chapter 600A termination, but it relied in part on section 232.116(2) "to flesh out the best-interest-of-the-child test." 911 N.W.2d at 771. Like Jeremy, the father in *Q.G.* physically abused the mother more than once while the children were present. That father was later charged with and convicted of domestic abuse assault, child endangerment, and possession of methamphetamine. *Id.* at 764. The *Q.G.* court provided a brutally honest recitation of the father's transgressions but ultimately held it was "not willing to write off" the incarcerated father's "potential positive contributions" to his children's lives. *Id.* at 771–74; *see also In re B.H.A.*, No. 18-0813, 2019 WL 2385902, at *5 (Iowa Ct. App. June 5, 2019) (opining, also in a chapter 600A case, "we should not be too quick to find termination of an incarcerated parent's rights is in the child's best interests").

To be sure, overlap exists between the best-interest considerations in section 232.116(2) and section 600A.1(2).[8] *See In re A.H.B.*, 791 N.W.2d 687,

---

[8] In the private-termination context, the legislature provided this description of best interests:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code § 600A.1(2).

690 (Iowa 2010) ("We have not provided a complete analytical framework to determine the best interest of the child under Iowa Code chapter 600A, but we find the statutory best interest framework described in Iowa Code section 232.116(2), (3) to be useful."). But we do not apply identical reasoning in both instances. In chapter 232 terminations, unlike chapter 600A terminations, the juvenile court is concerned with establishing permanency within a statutory-prescribed timescale after the State removes a child from his or her parents. *Compare* Iowa Code § 232.104(2), *with id.* § 600A.9; *see also In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (describing distinctions between chapters 232 and 600A and stressing "child's safety and need for a permanent home are paramount concerns" under chapter 232); *see also In re M.M.S.*, 502 N.W.2d 4, 9 (Iowa 1993) (observing "[t]here is not always the urgency in chapter 600A termination cases that we have noted in termination cases under the juvenile code").

Thus, in *Q.G.*, it was significant to the court that the incarcerated father would discharge his sentence in about a year. 911 N.W.2d at 764, 768. The court placed a stronger emphasis on the long-term interests of the children to have a relationship with their father. *Id.* at 774. And the father had demonstrated strides toward improving his parenting with substance-abuse treatment and parenting classes. *Id.* at 767–68; *see also B.H.A.*, 2019 WL 2385902, at *3.

Thus, our legislature and case law do not emphasize a concern with expeditious permanency in the context of private terminations as they do in chapter 232 terminations. Given that greater urgency here, we decline to find it is in these children's best interest to wait any longer for permanency.

As part of his best-interest argument, Jeremy urges a guardianship with the maternal grandmother would have benefited the children more than termination. He contends the closeness of the parent-child bond weighs against termination. *See* Iowa Code § 232.116(3)(c). Jeremy points to his "strained relationship" with the maternal grandmother since the death of the children's mother. Given that strain, he "does not believe the maternal grandmother will facilitate contact between him and the children without a guardianship in place."

We disagree that transferring guardianship and custody of A.R. and S.R. to the maternal grandmother is the optimal resolution. "[G]uardianship is not a legally preferable alternative to termination." *In re A.S.*, 906 N.W.2d 467, 477 (Iowa 2018); *see also In re of B.T.*, 894 N.W.2d 29, 34 (Iowa Ct. App. 2017) (approving order for guardianship with grandmother rather than terminating mother's parental rights where "mother and the grandmother [had] a close, mature, and healthy relationship that is free of conflict"). A child in a guardianship remains in flux because a parent can eventually petition for its closing. *See, e.g.*, Iowa Code §§ 232.104, 633.675. A guardianship is not permanent, and S.R. and A.R. would not experience the certainty of adoption.

Finally, while the children enjoy a loving relationship with Jeremy, they have remained outside his custody for nearly two years. They have achieved stability and are receiving the therapy they need while in their grandmother's care. Contrary to Jeremy's contention, section 232.116(3)(c) does not preclude termination. *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016).

**AFFIRMED.**

Greer, J., concurs; Potterfield, P.J., dissents.

**Potterfield, Presiding Judge** (dissenting).

I respectfully dissent. The majority distinguishes the present case with that of *In re Q.G.*, 911 N.W.2d 761 (Iowa 2018), but I am more persuaded by the similarities. Each involves an imprisoned father with a history of methamphetamine use and violent outbursts. In *Q.G.*, our supreme court focused on the "potential positive contributions" the father could make to his children's lives and reversed the termination of the father's rights. 911 N.W.2d at 774. Similarly, in another case involving an imprisoned father with a history of drug abuse, this court affirmed the district court's decision not to terminate, concluding, "The supreme court's analysis in *Q.G.* suggests we should not be too quick to find termination of an incarcerated parent's right is in the child[ren]'s best interests . . . ." *In re B.H.A.*, No. 18-0813, 2019 WL 2385902, at *5 (Iowa Ct. App. June 5, 2019).[9]

I recognize that *Q.G.* and *B.H.A.* are both cases involving private terminations under Iowa Code chapter 600A while the present case is governed by chapter 232. But, unlike the majority, I am not convinced there is a greater urgency in terminating the rights of an incarcerated parent in one framework over the other. Moreover, in this case, like in *Q.G.* and *B.H.A.*, the court's decision hinges on the children's best interests. The best-interests standard is largely the same under both chapter 232 and chapter 600A terminations. *See Q.G.*, 911 N.W.2d at 771 ("In addition to applying the language of Iowa Code section 600A.1, we have also borrowed from Iowa Code section 232.116(2) and (3) to

_____

[9] Because our analysis is based on step two of the three-step analysis, we need not consider the father's argument that the closeness of the parent-child bond should prevent termination. *See* Iowa Code § 232.116(3)(c).

flesh out the best-interest-of-the-child test. We consider the child's 'physical, mental, and emotional condition and needs' and the 'closeness of the parent-child relationship.'" (citations omitted)); *In re A.H.B.*, 791 N.W.2d 687, 690 (Iowa 2010) ("We have not provided a complete analytical framework to determine the best interest of the child under Iowa Code chapter 600A, but we find the statutory best interest framework described in Iowa Code section 232.116(2), (3) to be useful.").

For these reasons, I would reverse the termination of the father's parental rights.